Dwayne REYNOLDS, Petitioner,

v.

**PENNSYLVANIA BOARD OF PROBATION AND PAROLE, et al., Respondents.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 27, 2002.

Decided Oct. 21, 2002.

---

Dwayne Reynolds, petitioner, pro se.

Tara L. Patterson, Harrisburg, for respondent.

Before: McGINLEY, Judge, and
PELLEGRINI, Judge, and
McCLOSKEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Dwayne Reynolds (Reynolds) has filed a *pro se* petition for a writ of mandamus in our original jurisdiction against the Pennsylvania Board of Probation and Parole (Board) contending that the Board's application of a certain amendment to the Probation and Parole Act (Parole Act)[1] and changes to the Board's guidelines unconstitutionally violated the *ex post facto* clause of Article I, Section 10[1] of the United States Constitution[2] forbidding the states from passing any *ex post facto* law. After filing an answer to Reynolds' petition, the Board has filed an application for summary judgment.[3]

On November 30, 1993, Reynolds pled guilty to murder, aggravated assault and related offenses and was sentenced to serve not less than seven and no more than 15 years in a state prison. These offenses arose out of a murder on June 3, 1993, during the course of which Reynolds viciously beat and stabbed to death a man on the highway in Lebanon, Pennsylvania. His minimum term expiration date was June 6, 2000, and his maximum term expiration date is June 6, 2008. While incarcerated at the State Correctional Institution at Rockview from 1994 to 1999, Reynolds was found guilty of 21 prison misconducts and spent a total of 484 days in disciplinary custody, ten days on cell restriction and was assessed costs for property that he destroyed.

On March 14, 2000, approximately three months before the expiration of his minimum term date, the Board, on its own motion, interviewed Reynolds for parole. Following the interview, the Board refused to release him on parole after he served his minimum sentence. The Board's decision indicated that Reynolds was refused parole because "the mandates to protect the safety of the public and to assist in the fair administration of justice could not be achieved through his release on parole." The Board further indicated that Reynolds would be reviewed for parole again after June 2001, and whether he would be con-

---

**1.** Section 1 of the Act of August 6, 1941, P.L. 861, *as amended*, 61 P.S. § 331.1. That section provides:

> The parole system provides several benefits to the criminal justice system, including the provision of adequate supervision of the offender while protecting the public, the opportunity for the offender to become a useful member of society and the diversion of appropriate offenders from prison.
>
> In providing these benefits to the criminal justice system, the board shall first and foremost *seek to protect the safety of the public*. In addition to this goal, the board shall address input by crime victims and assist in the fair administration of justice by ensuring the custody, control and treatment of paroled offenders. (Emphasis added.)

**2.** Article I, Section 10[1] of the United States Constitution provides:

> [1] No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, *ex post facto Law*, or Law impairing the Obligation of Contracts, or grant any Title of Nobility. (Emphasis added.)

**3.** The Board actually filed a motion for summary relief which is properly evaluated according to summary judgment standards. *See Gartner v. Commonwealth of Pennsylvania, Board of Probation and Parole*, 79 Pa.Cmwlth. 141, 469 A.2d 697 (1983); Pa. R.A.P. 1532(b). In deciding a motion for summary judgment, an application for summary relief may be granted if a party's right to judgment is clear, *see* Pa. R.A.P. 1532(b), and no issues of material fact are in dispute. *Sanders v. Pennsylvania Board of Probation and Parole*, 651 A.2d 663 (Pa.Cmwlth.1994.)

sidered for parole would be dependent upon a favorable recommendation for parole from the Department of Corrections (DOC), his ability to maintain a clear conduct record, and his completion of the DOC's prescriptive programs.

On June 19, 2001, the Board again interviewed Reynolds for parole, but following the interview, it refused to release him on parole, even though he had served his minimum sentence. The Board's decision indicated that parole was refused for the same reason it had previously been denied. The decision stated that Reynolds was to be reviewed again for parole after June 2002, at which time the Board would review his file and consider whether he received a favorable recommendation for parole from the DOC; maintained a clear conduct record and completed the DOC's prescriptive programs.

On October 15, 2001, Reynolds filed a petition for a writ of mandamus in our original jurisdiction. He alleged that the Board's refusal on two occasions to grant him parole was in violation of the *ex post facto* clause of the United States Constitution, because it relied upon a statutory amendment enacted since his crime was committed that has made it harder for him to obtain parole, and has caused him to serve additional time because the amendment adds further punishment to his crime than that provided for in 1993 when he committed the crime. More specifically, he argues that the Board has retroactively applied to his 1993 murder conviction:

(1) the amended Parole Act which results in changing the bias in favor of the interests of the convict to that of the public when determining whether parole should be granted;

(2) unspecified amended "guideline/regulations" which violate the *ex post facto* clause;

(3) an amendment to the Parole Act that required three votes to parole him when only two votes were utilized; and

(4) a policy or practice under which the Board will not parole an offender who has been convicted of a violent crime as defined by the Violent Offender Incarceration and Truth–In–Sentencing Incentive Grants Act (VOI/TIS), 42 U.S.C. § 13701 *et seq.*, until the offender has served 85% of his maximum term.

The Board has filed a motion for summary judgment that is supported by an affidavit and a certificate of Board Chairman William F. Ward (Chairman Ward) in which he declares:

(1) the Board does not interpret the 1996 amendment to Section 1 of the Parole Act to affect its parole decision making and did not apply that amendment to Reynolds;

(2) to the extent of Reynolds' contention that unspecified guidelines decrease the chance of parole, the statistics show that the percentage of offenders paroled or reparoled increased from a rate of 42% in 1998, the year the guidelines form was revised, to 48% in 1999, the year after the guidelines form was revised;

(3) the two decisions to deny Reynolds' parole were not made by a majority vote but by panels consisting of one Board member and one Hearing Examiner; and

(4) the Board has never had a parole policy or practice that requires a violent offender to serve 85% of his maximum prison sentences before he is eligible for parole.[4]

---

4. The Board points out that Chairman Ward's certificate must be accepted into evidence by this Court pursuant to Section 8 of the Parole Act, 61 P.S. § 331.8, which provides:

Reynolds has not filed an answer to the motion for summary judgment or an affidavit in opposition to Chairman Ward's affidavit and certificate. We will address each of the Board's points in seriatim.

## I.

■ A state law violates the *ex post facto* clause of the United States Constitution if the law was adopted after the complaining party committed the criminal act and it inflicts a greater punishment than the law annexed to the crime when the crime was committed. *Coady v. Vaughn,* 564 Pa. 604, 770 A.2d 287, n. 2, (*citing California Department of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995)).

■ The United States Supreme Court recognizes that parole authorities should be given wide discretion and states must have due flexibility in formulating parole procedures and addressing problems of confinement and release. *Garner v. Jones,* 529 U.S. 244, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000). Nonetheless, the *ex post facto* prohibition may apply in parole cases, because the danger that legislatures might disfavor certain persons after the fact is present even in the parole context. *Id.* The controlling inquiry is whether retroactive application of the change in law creates "a sufficient risk of increasing the measure of punishment attached to the covered crimes." *Id.* at 250, 120 S.Ct. 1362, (quoting *Morales,* 514 U.S. at 509, 115 S.Ct. 1597). A change in the law that creates "only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes" does not violate the *ex post facto* clause. *Morales,* 514 U.S. at 509, 115 S.Ct. 1597.

To address the controlling constitutional inquiry, the Court utilizes both a "facial" and an "as-applied" analysis. The Court said that if "the rule does not by its own terms show a significant risk [of increased severity of punishment], the [petitioner] must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." *Jones,* 529 U.S. at 255, 120 S.Ct. 1362.

Applying this approach, the Court determined that two new parole rules did not facially violate the *ex post facto* prohibition by retroactive application. First, in *Morales,* the Court considered a California amendment permitting deferral of annual parole reconsiderations for up to three years for inmates serving convictions for multiple homicides. The Court found only the most speculative and attenuated possibility of increasing the severity of punishment. *Morales,* 514 U.S. at 509, 115 S.Ct. 1597. Three factors were emphasized by the Court: (1) the amendment applied only to a class of prisoners for whom the likeli-

---

The certificate of the chairman of the board, under the seal of the board and attested by the secretary, shall be accepted in evidence in any judicial proceeding in any court of this Commonwealth as adequate and sufficient proof of the acts and proceedings of the board therein certified to.

Our Supreme Court has held that courts may take judicial notice of a Certificate of the Chairman offered as evidence pursuant to 61 P.S. § 331.8. *Commonwealth ex rel. Jones v.*

*Rundle,* 413 Pa. 456, 199 A.2d 135 (1964). Not only does this section allow the Chairman's certificate to act as sufficient proof, but his affidavit may also serve as evidence upon which we may rely because a motion for summary judgment is based "not only upon the averments of the pleadings but may also consider discovery depositions, admissions *and affidavits."* (Emphasis added.) *Salerno v. Philadelphia Newspapers, Inc.,* 377 Pa.Super. 83, 546 A.2d 1168, 1170 (1988).

hood of release on parole was quite remote; (2) the amendment did not alter the timing of any prisoner's initial parole hearing and affected the timing of subsequent hearings only if the parole board specifically found it unreasonable to expect parole during the interval; and (3) the board retained the authority to tailor the frequency of subsequent hearings. *Id.* at 510–511, 115 S.Ct. 1597.

Second, in *Jones,* the Court confronted a Georgia statute which increased the interval between parole reconsideration hearings. The Court found no facial invalidity of the amendment, stressing two factors: (1) the parole board retained discretion as to how frequently to set an inmate's reconsideration hearing; and (2) the statute permitted expedited parole reviews to consider a change in circumstances or new information. *Jones,* 529 U.S. at 254, 120 S.Ct. 1362. The Court remanded the case for consideration of whether, as applied to petitioner's sentence, the amendment created a significant risk of increasing his punishment. *Id.* at 255–57, 120 S.Ct. 1362.[5]

Consequently, in order for Reynolds to prevail in this case, he must prove either that 61 P.S. § 331.1 facially violates the proscription against *ex post facto* laws or that, as applied to him, the amendment creates a significant risk of increasing the severity of his punishment.

## II.

### A.

Reynolds contends that the retroactive application of 61 P.S. § 331.1 caused him to be denied parole and serve more time. He points out that Section 21(a) of the Parole Act provides that parole is appropriate whenever "the best interests of the convict justify or require his being paroled and it does not appear that the interests of the Commonwealth will be injured thereby," 61 P.S. § 331.21(a), while the 1996 amendment to Section 1 of the Parole Act, 61 P.S. § 331.1, requires that the Board "shall first and foremost seek to protect the safety of the public."[6] Reynolds argues that this amendment changed the parole review process so that it no longer begins with the best interest of the convict but rather with the safety of the public, and is "a retrospective change in statutory focus that prejudices a petitioner by making it harder to obtain parole states a claim for ex post facto violations." (Reynolds petition at 4.) He contends that despite the fact that he complied with the parole requirements by completing all of the DOC programs and obtaining a DOC recommendation, he was still denied parole

**5.** In contrast, the Court has found one Parole Act amendment violative of the *ex post facto* clause when applied retroactively. In *Lynce v. Mathis,* 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997), a state statute retroactively cancelled provisional early release credits. Petitioner, who had been released, was arrested and reconfined. The obvious increase in punishment persuaded the Court that the statute violated the Constitution's ban on *ex post facto* lawmaking.

**6.** Prior to its amendment, Section 1 provided the following:

The value of parole as a disciplinary and corrective influence and process is hereby recognized, and it is declared to be the public policy of this Commonwealth that persons subject or sentenced to imprisonment for crime shall, on release therefrom, be subjected to a period of parole during which their rehabilitation, adjustment and restoration to social and economic life and activities shall be aided and facilitated by guidance and supervision under a competent and efficient parole administration and to the end it is the intent of this act to create a uniform and exclusive system for the administration of parole in this Commonwealth.

and consequently has had to serve additional time.

In response, the Board argues that it does not interpret that amendment to affect its decision making, and relevant to this case, the amendment had no effect on its decision to refuse Reynolds parole. Rather, the Board argues that it relied upon the factors set forth in Section 19 of the Parole Act, 61 P.S. § 331.19, to deny Reynolds parole on two occasions, specifically his 21 prison misconducts and 484 days in disciplinary custody while in prison.[7]

As to whether this change in the Parole Act as applied to him violates the *ex post facto* clause, although Reynolds argues that the application of 61 P.S. § 331.1 caused him to be denied parole and to serve a longer sentence than he was ordered to serve, he did not file any countervailing affidavits pursuant to Pa. R.C.P. No. 1035.3 [8] that this section of the Parole Act was applied to his case. As a result, the only evidence before us is the Board's affidavit and certificate and they specify that Section 1 of the Parole Act was not

applied to Reynolds' case and did not increase the likelihood that he would be refused parole. Rather, they aver that they relied upon the factors contained in 61 P.S. § 331.19 regarding his prison behavior and applied those factors to his case. Because Reynolds has failed to respond to the Board's affidavit and certificate, we must accept the averments of the Board which are fatal to his case.

As to whether Section 1 of the Parole Act facially violates the proscription against *ex post facto* laws, we hold that it does not. As the Board points out in Chairman Ward's affidavit and certificate, the former and current versions of Section 1 of the Parole Act are general statements of public policy and philosophy and do not affect an offender's eligibility or opportunity to be paroled. Rather, they are a legislative emphasis and reminder to the Board to make paroling decisions in accordance with the factors set forth in 61 P.S. § 331.19. Section 1 does not change the parole review process so that it no longer begins with the best interest of the convict because 61 P.S. § 331.21 also states that

---

**7.** Section 19 of the Parole Act provides the following:

It shall be the duty of the board, upon the commitment to prison of any person whom said board is herein given the power to parole, to consider the nature and circumstances of the offense committed, any recommendations made by the trial judge and prosecuting attorney, the general character and background of the prisoner, participation by a prisoner who is serving a sentence for a crime of violence as defined in 42 Pa.C.S. § 9714(g) (relating to sentences for second and subsequent offenses) in a victim impact education program offered by the Department of Corrections and the written or personal statement of the testimony of the victim or the victim's family submitted pursuant to section 22.1 of this act. The board shall further consider the notes of testimony of the sentencing hearing, if any, together with such additional information regarding the nature and circum-

stances of the offense committed for which sentence was imposed as may be available. The board shall further cause the conduct of the person while in prison and his physical, mental and behavior condition and history, his history of family violence and his complete criminal record, as far as the same may be known, to be reported and investigated. All public officials having possession of such records or information are hereby required and directed to furnish the same to the board upon its request and without charge therefore so far as may be practicable while the case is recent.

**8.** Pursuant to Pa. R.C.P. No. 1035.3, an adverse party may not rest upon the pleadings, but must respond to the summary judgment motion by identifying issues of fact arising from evidence in the record or evidence in the record establishing the facts essential to the defense.

parole will be appropriate when "it does not appear that the interests of the Commonwealth will be injured thereby." Therefore, Section 1 only reemphasizes that there is a pre-existing consideration of public safety as already indicated in 61 P.S. § 331.21, not that Section 1 creates a significant risk of increasing the severity of Reynolds' punishment. Section 1 does not modify the statutory punishment for any particular offense, does not it alter the standards for determining the initial date of parole eligibility and does not alter existing standards for an inmate's suitability for parole. Consequently, the Board's order denying Reynolds parole did not violate the *ex post facto* clause of the United States Constitution.

### B.

Addressing next Reynolds' contention that the Board applied amended guidelines to deny his parole, he fails to specify what the guidelines provided previously and which portion of the guidelines were amended and utilized by the Board to deny his parole. In his affidavit, Chairman Ward explains that the guidelines are a form entitled "Parole Decision Making Guidelines" and are used as recommendations in reviewing offenders for parole. He further states that the guidelines were

in use when Reynolds murdered his victim on June 3, 1993, and were revised in April 1998. He then discusses statistics compiled by the Board showing that the percentage of offenders paroled or reparoled did not decrease following the 1998 revision of the guidelines form, but instead increased from a rate of 42% in 1998 to 48% in 1999. Chairman Ward additionally points out that in addition to the guidelines recommendations, the Board also considers numerous other factors.[9] Nonetheless, the Board avers that it is not bound to follow any recommendations regarding the grant or denial of parole that might appear on the guidelines form, and it adheres to no formal guidelines in making parole decisions. Both because we are unable to determine what guideline is involved and because there is no evidence that the Board relied upon amended guidelines to deny Reynolds parole, there is no evidence that it violated the *ex post facto* clause of the United States Constitution.

### C.

█ Reynolds also makes the following argument in his petition regarding the number of votes required by the Board to obtain parole:

9. Those factors include:

a. the recommendations of all prison wardens and superintendents in charge of the institutions in which the offender has been confined;
b. the recommendation(s) of the sentencing judge(s);
c. the recommendation(s) of the prosecuting attorney(s);
d. any victim input;
e. any prior parole supervision history;
f. the statements of the offender during a parole interview;
g. the demeanor of the offender during a parole interview;
h. the offender's proposed parole plan;
i. any sex offender reports;

j. any mental health reports;
k. any medical reports that would indicate a physical inability to commit further anti-social acts;
l. any detainers reflecting unresolved criminal charges, other sentences of confinement, or potential deportation;
m. any notes of testimony from the sentencing hearing(s);
n. the complete criminal record of the offender;
o. the complete nature and circumstances of the offense(s);
p. physical history of the offender;
q. mental history of the offender;
r. behavior history of the offender;
s. the offender's history of family violence.

19. However, in addition the voting process has changed. 20. In the instant case the board required this petitioner to gain five favorable votes. 21. The Amended statute requires three votes, and statute that applies to the instant case requires two votes. See and compare Section 331.4(b) (1941) to 331.4(b) (1996).

22. This change in the law, implements several measures that was not annexed to the crimes here when originally committed and punishment was imposed.

While it is unclear whether Reynolds is arguing that the same number of votes should now be required that used to be required at the time he was convicted and sentenced for his crime or that three votes were required at the time of his most recent parole denials, what is clear is that the affidavit of Chairman Ward specified that the decisions were made by a panel consisting only of two people—a hearing officer and a board member—as required under Section 4(b) of the Parole Act, 61 P.S. § 331.4(b). That section provides:

> The board may make decisions on parole, reparole, return or revocation in panels of two persons. A panel shall consist of one board member and one hearing examiner or of two board members. Panels shall be appointed by the chairman of the chairman's designee.

Because Reynolds did not provide any countering evidence that the Board did not follow its own current procedure and does not explain how he was harmed by its failure to follow a former procedure if that was, in fact, his argument, even if valid, the Board did not violate the *ex post facto* clause of the United State Constitution when it twice denied him parole by a panel of two.

### D.

■ Finally, we address Reynolds' contention that the Board refused to parole him because it had a policy that it would not parole prisoners convicted of a violent crime until the offender had served 85% of his maximum term. Chairman Ward's affidavit, however, indicates that the Board has never had a parole policy or practice that requires violent offenders convicted of VOI/TIS crimes to serve 85% of their maximum prison sentences before being eligible for parole. In fact, he states that pursuant to Section 21 of the Parole Act, 61 P.S. § 331.21, the Board has no power to parole an offender before he has served 100% of his minimum prison term. Because Reynolds has not provided any evidence to support his contention but has only made a bald assertion, he has failed to prove that the Board violated the *ex post facto* clause in denying him parole.

Accordingly, the Board's application for summary judgment is granted and Reynolds' petition for a writ in mandamus is denied.

### ORDER

AND NOW, this *21st* day of *October*, 2002, the motion for summary judgment filed by the Pennsylvania Board of Probation and Parole is granted and the petition for a writ in mandamus filed by Dwayne Reynolds is denied.