851 A.2d 859

**Bryan P. HALL, Appellant**

v.

**PENNSYLVANIA BOARD OF PROBATION AND PAROLE, Appellee.**

Supreme Court of Pennsylvania.

Submitted July 9, 2003.

Decided June 22, 2004.

Bryan P. Hall, pro se.

Robert Campolongo, Arthur R. Thomas, Calvin Royer Koons, Harrisburg, for PA Bd. of Probation and Parole.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

### OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice NEWMAN.

Bryan P. Hall (Hall) appeals from an Order of the Commonwealth Court, which dismissed his *pro se* Petition for Review in the Nature of Mandamus, brought in the original jurisdiction of the Commonwealth Court. Hall contends that the Pennsylvania Board of Probation and Parole (Board) improperly denied his numerous requests for parole by judging his applications pursuant to standards enacted in 1996, five years after his date of sentence. For the reasons discussed herein, we affirm the Order of the Commonwealth Court.

### FACTS AND PROCEDURAL HISTORY

Hall is currently serving a prison sentence of four to twenty years at the State Correctional Institution in Dallas, Pennsylvania, for convictions of aggravated assault,[1] aggravated inde-

1. 18 Pa.C.S. § 2702.

cent assault,[2] and related charges stemming from his arrest on June 26, 1991. Hall, who has been incarcerated since his arrest, had a minimum sentence date of June 28, 1995, and a maximum sentence date of June 28, 2011. He appeared before the Board on May 24, 1995, in anticipation of the expiry of his minimum sentence term. In a decision dated June 13, 1995, the Board denied parole based on the following factors: (1) substance abuse; (2) habitual offender; (3) assaultive instant offense; (4) very high assaultive behavior potential; (5) the need for treatment; (6) failure to benefit from treatment programs for sex offenders or substance abuse; and (7) an unfavorable recommendation from the Department of Corrections. Reproduced Record (R.R.) at A–1. The Board informed Hall that to improve his parole candidacy he: (1) must participate in prescriptive programs; (2) maintain a clear conduct record; and (3) earn an institutional recommendation from the Department of Corrections. *Id.*

From 1996 through 1998, on an annual basis, Hall appeared before the Board, which rejected his parole requests, citing itemized reasons and indicators that it would review at his next parole hearing. *Id.* at A–2, A–3, A–4. Hall again appeared before the Board on March 11, 1999. Again, the Board denied parole, this time explaining that "[f]ollowing an interview and review of your file, the Pennsylvania Board of Probation and Parole has determined that the mandates to protect the safety of the public and to assist in the fair administration of justice cannot be achieved through your release on parole." *Id.* at A–5. The Board used the same language in a decision denying parole filed in 2000. *Id.* at A–6. The Board supported its parole denials on April 10, 2001, and June 13, 2002, with the following language "[f]ollowing an interview and review of your file, the Pennsylvania Board of Probation and Parole has determined that the fair administration of justice cannot be achieved through your release on parole." *Id.* at A–7, A–8.

On July 9, 2002, Hall filed a *pro se* Petition for Review in the nature of a request for *mandamus* in the original jurisdic-

---

**2.** 18 Pa.C.S. § 3125.

tion of the Commonwealth Court. Hall contended that the 1996 amendments to the Parole Act [3] materially changed the criteria for granting and denying parole, and that application of the amended Parole Act to his parole requests violated the constitutional prohibition against *ex post facto* laws. Specifically, Hall contended that the 1996 amendments shifted the policy statement of the Board from one that recognized the "value of parole as a disciplinary and corrective influence and process" to one that emphasizes the protection of public safety. 61 P.S. § 331.1 (1995 and 2003). The Board sought a stay of the matter pending the Commonwealth Court's disposition of *Reynolds v. Pennsylvania Board of Probation and Parole*, 809 A.2d 426 (Pa.Cmwlth.2002). The Commonwealth Court decided *Reynolds* on October 21, 2002, rejecting similar arguments to those presented *sub judice*.

On October 28, 2002, while the Commonwealth Court proceedings were stayed, the Board modified its June 13, 2002 decision to deny parole to read as follows:

> Following an interview with you and a review of your file, and having considered all matters required pursuant to the Parole Act of 1941, as amended, 61 P.S. § 331.1 et seq., the Board of Probation and Parole, in the exercise of its discretion, has determined at this time that: your best interests do not justify or require you being paroled/reparoled; and, the interests of the Commonwealth will be injured if you were paroled/reparoled. Therefore, you are refused parole/reparole at this time. The reasons for the Board's decision include the following:
>
> The recommendation made by the prosecuting attorney.
>
> Reports, evaluations and assessments concerning your physical, mental and behavior condition and history.
>
> Other factors deemed pertinent in determining that you should not be paroled: your prior criminal history.

R.R. at A–9. On November 26, 2002, relying on *Reynolds*, the Commonwealth Court denied the Petition for Review filed by

---

**3.** Act of August 6, 1941, P.L. 861, *as amended*, 61 P.S. §§ 331.1–331.34a.

Hall. Hall now appeals to this Court, contending that application of the 1996 amendments to the Parole Act to his parole requests operated in contravention of the prohibition of the *ex post facto* clause contained in the United States Constitution. U.S. CONST. Art. I § 10 ("[n]o state shall ... pass any ... ex post facto law").

## DISCUSSION

Though the claims herein presented by Hall concern application of the Parole Act, the resolution of this matter turns on the principles of separation of powers and *stare decisis,* rather than the substantive arguments raised by Hall.

Just last year, in *Winklespecht v. Pennsylvania Board of Probation and Parole,* 571 Pa. 685, 813 A.2d 688 (2002), this Court was faced, *inter alia,* with the exact question Hall presents today: does application of the newly-amended Parole Act to an inmate sentenced prior to the promulgation of those amendments violate the *ex post facto* clause of the United States Constitution? [4] Although we filed *Winklespecht* as a fractured Opinion Announcing the Judgment of the Court, at least three Justices agreed that there was no *ex post facto* violation. *See id.* at 691–692 ("[t]he rewording of 61 P.S. § 331.1 did not create a substantial risk that parole would be denied any more frequently than under the previous wording, nor did the addition of this language create a new offense or increase the penalty for an existing offense") (Opinion Announcing the Judgment of the Court per Eakin, J.); *id.* at 693 ("I fully agree ... with the lead opinion's conclusion that the constitutional *ex post facto* claim raised here ... is entirely meritless") (Castille, J., concurring, joined by Newman, J.); *id.* at 697.[5] However, subsequently, a clear majority of this Court explicitly held that application of the 1996 amendments

---

**4.** Walter Winklespecht was convicted and sentenced in 1988 for rape, involuntary deviate sexual intercourse, and aggravated assault. The trial court sentenced him to seven to twenty years' imprisonment and a consecutive term of five years' probation.

**5.** Mr. Chief Justice Emeritus Zappala, Mr. Chief Justice Cappy, and Mr. Justice Nigro did not express any opinion on whether application of the 1996 amendments to the parole request of Winklespecht violated the *ex post facto* clause. Mr. Justice Saylor, while not expressing a definitive

to the Parole Act to individuals incarcerated prior to the effective date of those amendments did not violate the *ex post facto* clause. *Finnegan v. Pennsylvania Board of Probation and Parole*, 576 Pa. 59, 838 A.2d 684 (2003).[6]

Seven weeks after *Winklespecht*, on February 21, 2003, the United States Court of Appeals for the Third Circuit, faced with an identical substantive contention, decided *Mickens–Thomas v. Vaughn*, 321 F.3d 374 (3d Cir.2003). The Third Circuit rejected the determination of this Court in *Winklespecht*, finding instead that applying the 1996 amendments to Mickens–Thomas, who had been sentenced in 1969, violated the *ex post facto* prohibition. The Third Circuit found that parole policy in the Commonwealth shifted after 1996, which calculably lessened the chances that an inmate would be paroled. The Third Circuit reasoned as follows:

[P]rior to 1996, the Board's concern for potential risks to public safety could not be the sole or dominant basis for

view on the issue, stated: "[w]hile the statutory changes may have placed particular emphasis on . . . considerations [such as public safety and the fair administration of justice], any conclusion that there is a substantial risk of prolonging incarceration sufficient to offend *ex post facto* prohibitions would appear to be based on mere conjecture." *Winklespecht*, 813 A.2d at 697 (Saylor, J., concurring and dissenting).

6. Mr. Justice Eakin authored the majority opinion in *Finnegan*, which Messrs. Justice Castille and Lamb, and myself, joined. The dissent makes it a point to de-emphasize the precedential value of *Finnegan* because of *Finnegan's* reliance on the plurality opinion in *Winklespecht*. Nevertheless, four justices in *Finnegan* agreed that application of the 1996 amendments to the Parole Act to persons sentenced prior to the amendments does not violate the *ex post facto* clause and, therefore, whether or not the Court erred in counting a majority in *Winklespecht* is of no moment because there is a clear majority in *Finnegan*. *See Finnegan*, 838 A.2d at 690 ("[w]e reiterate that the 1996 revision of . . . the Parole Act does not violate the *ex post facto* clause when applied to a prisoner convicted prior to the revision").

All alleged counting errors aside, we have considered and flatly rejected the arguments raised by the dissent concerning application of *Garner v. Jones*, 529 U.S. 244, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000), and *California Department of Corrections v. Morales*, 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). *See Finnegan*, 838 A.2d at 688. In resurrecting these arguments, regrettably, the dissent attempts to revive the substantive dispute that has been settled definitively by a majority of this Court. In spite of these efforts, we refuse to alter the purely jurisprudential nature of this decision.

parole denial under the existing Guidelines. Considerations of public safety were already incorporated into its Guidelines analysis; the Board had to point to "unique" factors as a basis for its rejection of the Guidelines. Moreover, the Board had to weigh all factors, militating for and against parole, and make its decision on the totality of the factors pertinent to parole, and give appropriate weight to the interests of the inmate. Heavy foot application on one factor could not have been the basis of granting or rejecting parole. Policy declarations in and after 1996 demonstrate that Board stance shifted and that, indeed, post–1996 considerations of public safety became the dominant concern of the Board

*Id.* at 386. The Third Circuit has reaffirmed its position on at least two subsequent occasions: *Hollawell v. Gillis,* 65 Fed. Appx. 809 (3d Cir.2003) (memorandum), *cert. denied,* — U.S. ——, 124 S.Ct. 229, 157 L.Ed.2d 136 (October 6, 2003), and *McLaurin v. Larkins,* 76 Fed.Appx. 415 (3d Cir.2003) (memorandum).[7] Hall recognized this divergence in legal authority when he asked us to consider his appeal in light of *Mickens–Thomas.* Accordingly, given our rejection of the *ex post facto* argument in *Winklespecht,* as clarified by *Finnegan,* at this juncture our concern is no longer a question of whether there is an *ex post facto* violation, but whether we are constrained by *Mickens–Thomas.*

It is beyond cavil that this Court is bound by the determinations of the United States Supreme Court on issues of federal law, including the construction and interpretation of the federal constitution. *Purple Orchid, Inc. v. Pennsylvania State Police,* 572 Pa. 171, 813 A.2d 801, 806 (2002) (citing *Pennsylvania State Police, Bureau of Liquor Control Enforcement v. Hospitality Investments of Philadelphia, Inc.,* 547 Pa. 142, 689 A.2d 213, 216 (1997)). However, whether or not this Court has a responsibility to adhere to the pronouncements of inferior federal courts on matters of federal law, where the United States Supreme Court has not spoken, is

---

**7.** In a footnote in *McLaurin,* the Third Circuit noted that *certiorari* is pending in *Mickens–Thomas. McLaurin,* 76 Fed.Appx. 415 at n. 3.

less certain. There appear to be four schools of thought on this question: (1) a decision of an inferior federal court should be treated as persuasive, but not binding, authority; (2) a decision of an inferior federal court should be followed, if reasonably possible, to avoid a conflict between state and federal resolutions of the same question; (3) a decision of an inferior federal court binds the state court; and (4) if the decisions of the inferior federal courts are "numerous and consistent," the state court must follow their dictates.

A vast majority of state supreme courts that have addressed this issue have adopted the first approach. *See, e.g., Totemoff v. State,* 905 P.2d 954 (Alaska 1995), *cert. denied,* 517 U.S. 1244, 116 S.Ct. 2499, 135 L.Ed.2d 190 (1996); *Custom Microsystems, Inc. v. Blake,* 344 Ark. 536, 42 S.W.3d 453 (2001); *Hill v. Thomas,* 973 P.2d 1246 (Colo.1999), *affirmed,* 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000); *Macon–Bibb County Hospital Authority v. National Treasury Employees Union,* 265 Ga. 557, 458 S.E.2d 95 (1995); *Indiana Department of Public Welfare v. Payne,* 622 N.E.2d 461 (Ind.1993); *Shell Oil Company v. Secretary, Revenue and Taxation,* 683 So.2d 1204 (La.1996); *ACE Property Casualty and Insurance Co. v. Commissioner of Revenue,* 437 Mass. 241, 770 N.E.2d 980 (2002);[8] *In Re 3628 v. Street,* 262 Neb. 77, 628 N.W.2d 272 (2001); *Dewey v. R.J. Reynolds Tobacco Co.,* 121 N.J. 69, 577 A.2d 1239 (1990); *Custom Cabinet Factory of New York, Inc. v. Eighth Judicial District Court ex rel. County of Clark,* 119 Nev. 51, 62 P.3d 741 (2003); *Bogart v. CapRock Communications Corp.,* 69 P.3d 266 (Okla.2003); *State v. Austin,* 165 Vt. 389, 685 A.2d 1076 (1996); *Election Board of State of Wisconsin v. Wisconsin Manufacturers & Commerce,* 227

8. *But see Commonwealth v. Masskow,* 362 Mass. 662, 290 N.E.2d 154 (1972). In *Masskow,* the Supreme Judicial Court of Massachusetts noted the general rule that decisions of federal appeals courts are persuasive, but that "[i]t would be undesirable ... to affirm the conviction of a defendant if the inevitable consequence were that he would be released on a writ of habeas corpus." *Id.* at 157. Accordingly, without deciding the issue, for purposes of the case, the Supreme Judicial Court of Massachusetts assumed that the federal appeals court "accurately state[d] the [f]ederal law." *Id.* Ultimately, however, the *Masskow* Court did not follow the federal precedent, finding the case distinguishable on its facts.

Wis.2d 650, 597 N.W.2d 721 (1999), *cert. denied,* 528 U.S. 969, 120 S.Ct. 408, 145 L.Ed.2d 318 (1999).

At least two jurisdictions give slightly more deference to the federal appeals court of the circuit where the state is located. *Red Maple Properties v. Zoning Commission,* 222 Conn. 730, 610 A.2d 1238, 1242 n. 7 (1992) ("It would be a bizarre result if this court [adopted one analysis] when in another courthouse, a few blocks away, the federal court, being bound by the Second Circuit rule, required [a different result]"); *Littlefield v. State, Department of Human Services,* 480 A.2d 731, 737 (Me.1984) ("even though only a decision of the Supreme Court of the United States is the supreme law of the land on a federal issue ... nevertheless, in the interests of existing harmonious federal-state relationships, it is a wise policy that a state court of last resort accept, so far as reasonably possible, a decision of its federal circuit court on such a federal question").

Mississippi and New Hampshire hold that they are constrained by the interpretations of federal law forwarded by the Fifth and First Circuits, respectively. *Columbus Paper and Chemical, Inc. v. Chamberlin,* 687 So.2d 1143 (Miss.1996); *Desmarais v. Joy Manufacturing Co.,* 130 N.H. 299, 538 A.2d 1218 (1988). Finally, Alabama, California, and Illinois will consider themselves bound by interpretations of inferior federal courts, but only where the decisions of those courts are "numerous and consistent." *Etcheverry v. Tri–Ag Service, Inc.,* 22 Cal.4th 316, 93 Cal.Rptr.2d 36, 993 P.2d 366, 368 (2000).[9] *See also Ex Parte Bozeman,* 781 So.2d 165 (Ala.2000), *affirmed,* 533 U.S. 146, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001), and *Bishop v. Burgard,* 198 Ill.2d 495, 261 Ill.Dec. 733, 764 N.E.2d 24 (2002).

Almost forty years ago, we were faced with the same question of whether and how to consider the interpretations of inferior federal courts on matters of federal law when we

---

**9.** *But see People v. Bradford,* 15 Cal.4th 1229, 65 Cal.Rptr.2d 145, 939 P.2d 259 (1997), *cert. denied,* 523 U.S. 1118, 118 S.Ct. 1796, 140 L.Ed.2d 937 (1998) (viewing the decisions of federal courts of appeal as persuasive, but not binding authority).

decided *Commonwealth v. Negri,* 419 Pa. 117, 213 A.2d 670 (1965). In *Negri,* the question we intended to answer was whether we should adhere to our interpretation of *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) (predecessor to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)), or the conflicting analysis followed by the Third Circuit Court of Appeals. We recognized the problem inherent in interpreting federal law in a manner inconsistent with the reasoning advanced by the Third Circuit Court of Appeals, explaining that:

> If the Pennsylvania courts refuse to abide by [the Third Circuits] conclusions, then the individual to whom we deny relief need only to "walk across the street" to gain a different result. Such an unfortunate situation would cause disrespect for the law. It would also result in adding to the already burdensome problems of the Commonwealths trial courts, which look to us for guidance. Finality of judgments would become illusory, disposition of litigation prolonged for years, the business of the courts unnecessarily clogged, and justice intolerably delayed and frequently denied.

*Negri,* 213 A.2d at 672. Ultimately, however, this rationale for applying Third Circuit precedent was rendered mere *dictum* because we determined that *Escobedo* was not retroactive and, therefore, avoided choosing between the two alternatives. *Id.* at 676.[10]

More recently, in a number of decisions, this Court has clearly indicated that we are not obligated to follow the decisions of the Third Circuit on issues of federal law. *See, e.g., Commonwealth v. Cross,* 555 Pa. 603, 726 A.2d 333 (1999) (this Court not bound by a Third Circuit decision interpreting United States Supreme Court jurisprudence); *Commonwealth v. Ragan,* 560 Pa. 106, 743 A.2d 390 (1999) (this Court is not constrained by a Third Circuit decision interpreting federal

10. One year after *Negri,* the United States Supreme Court, in *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), approved the Third Circuit's approach and, accordingly, we conceded to the federal interpretation in *Commonwealth ex rel. Wilkes v. Maroney,* 423 Pa. 113, 222 A.2d 856, 858–859 (1966), and *Commonwealth v. Senk,* 423 Pa. 129, 223 A.2d 97, 99 (1966).

law); *Commonwealth v. Chester,* 557 Pa. 358, 733 A.2d 1242 (1999) (same); *Commonwealth v. Laird,* 555 Pa. 629, 726 A.2d 346 (1999) (same). Similarly, as early as 1962, we held that we are not bound by the decisions of other federal Circuit Courts of Appeal. *Breckline v. Metropolitan Life Insurance Co.,* 406 Pa. 573, 178 A.2d 748 (1962) (Ninth Circuit ruling on federal question does not bind this Court).

While we recognize the concerns articulated in *Negri* regarding conflicting interpretations of federal law by this Court and the Third Circuit, we must reaffirm our *Winklespecht/Finnegan* analysis. As a foundational matter, the cited portion of *Negri* was dicta, and in the intervening period, this Court, as well as most other state courts, have determined that they are not bound by the decisions of inferior federal courts. Further, if we were to relent from our newly announced positions merely because the Third Circuit, or any other inferior federal court, has reached a conflicting resolution, we would breed the same disrespect for the law, the concern over which we articulated in *Negri.* To follow this path, would render illusory the finality of judgments within our Commonwealth. Therefore, rather than reversing the position we took one year ago; we believe that it is more jurisprudentially sound to confirm our prior decision.

Within our federal system of governance, there is only one judicial body vested with the authority to overrule a decision that this Court reaches on a matter of federal law: the United States Supreme Court. Absent a contrary ruling from that tribunal, it is the law of this Commonwealth that application of the 1996 amendments to the Parole Act to persons sentenced prior to their adoption does not violate the *ex post facto* clause of the United States Constitution.

## CONCLUSION

For the reasons discussed above, we affirm the Order of the Commonwealth Court.

Justice BAER concurs in the result.

Chief Justice CAPPY files a dissenting opinion in which Justices NIGRO and Saylor join.

Chief Justice CAPPY dissenting.

Like the majority, I agree that a decision of an inferior federal court should be treated by this court as persuasive, but not binding, authority, where that decision interprets federal law. I, however, recognize that the decisions of the United States Supreme Court on such matters are controlling. Unlike the majority, therefore, I would find that the decision of the Third Circuit Court of Appeals on the *ex post facto* question involved in this case, in adhering to recent pronouncements of the High Court, is persuasive in its interpretation of federal law. Accordingly, I am compelled to dissent.

At issue here is the retroactive application of the 1996 amendments to the Parole Act[1] and whether applying those provisions to a person sentenced prior to 1996 violates the *ex post facto* clause of the United States Constitution. Appellant has been in prison since 1991. The heart of Appellant's argument is that in all probability under the parole system as it existed at the time he committed his offense, was convicted, and sentenced, he would have been paroled, while under the current system he is ineligible for parole. Appellant points to the amendments to the 1996 Parole Act that he asserts altered the focus of the parole policy in Pennsylvania from one that centered on the rehabilitation of the offender to one that now emphasizes public safety, deterrence, and the incapacitation of criminals. Appellant asserts that the retroactive application of the policy created through the 1996 amendments to his application for parole causes him to suffer a longer period of incarceration than if his parole application were considered under the pre–1996 policy, thereby creating an *ex post facto* violation.

This exact argument was presented, and rejected by our court in two recent decisions, *Winklespecht v. Pa. Bd. of Probation and Parole*, 571 Pa. 685, 813 A.2d 688 (2002) and

1. The specific provision at issue is found at 61 P.S. § 331.1.

*Finnegan v. Pa. Bd. Probation and Parole,* 576 Pa. 59, 838 A.2d 684 (2003). Before discussing the specifics of those two cases, however, I believe a brief review of the United States Supreme Court decisions in *California Department of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) and *Garner v. Jones,* 529 U.S. 244, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000) is warranted. In each of those cases, the Court was faced with an argument that a decrease in the frequency of scheduled parole hearings constituted an *ex post facto* violation as to the prisoners sentenced under the prior scheme. In *Morales,* the changes occurred via statutory enactment; while in *Garner,* the change in frequency of parole hearings was accomplished through the exercise of the parole board's legitimate discretion. In each case, based on the specific facts presented, the Court found no *ex post facto* violations. However, the critical points made in those cases are first, that retroactive changes in the laws governing parole **may** violate the *ex post facto* clause; and second, that the test for determining if such a violation has occurred is "whether retroactive application of the change in law created a significant risk of increased punishment." *Garner,* at 256, 120 S.Ct. 1362. With these important points in mind, we return to a consideration of the case law as it developed in our court.

*Winklespecht* was a plurality opinion. The Appellant had presented his *ex post facto* challenge to the denial of his parole application by bringing a petition for the writ of habeas corpus. The court was presented with two questions, whether a writ of habeas corpus was the correct means to challenge the denial of parole, and whether Appellant had suffered an *ex post facto* violation. Three of the justices agreed that the 1996 amendments to the Parole Act did not violate the *ex post facto* clause. The opinion announcing the judgment of the court (OAJC) reasoned that although the 1996 amendments added new language, the alteration in wording did not create a change in the concepts considered by the parole board when exercising its discretion over an application for parole. According to the OAJC, a reordering of the considerations necessary to resolve an application for parole could not result in an *ex post facto* violation. 813 A.2d at 691–92. Two

justices concurred in the result without opinion. I authored a short opinion concurring in result only. I agreed with dismissing the writ of habeas corpus as I believed that a writ of mandamus was the correct method for challenging a denial of parole; and that resolution of the case should have ended short of a discussion on the merits of the *ex post facto* claim. *Id.* at 692. Justice Castille concurred in the OAJC, with the exception that he believed a habeas petition to the trial court would be the best means to adjudicate constitutional challenges to a denial of parole. *Id.* at 693. Justice Saylor authored a concurring and dissenting opinion. In sum, he agreed that there was no facial violation of the *ex post facto* clause and that Appellant could not establish a constitutional violation without pleading and proving that the new guidelines effected a change in the rate at which prisoners were paroled. *Id.* at 700. However, in the portion of his opinion concurring in the result, Justice Saylor, viewing the *ex post facto* claim in light of the decisions in *Morales* and *Garner*, stated that he would not go as far as the OAJC, leaving open the possibility that a prisoner could meet the burden of demonstrating an *ex post facto* violation through the application of the 1996 amendments in a specific case. *Id.* at 697.

Following this court's decision in *Winklespecht*, the Third Circuit Court of Appeals addressed the identical issue in *Mickens–Thomas v. Vaughn*, 321 F.3d 374 (3d Cir.2003) and reached the opposite conclusion than did the plurality on the *ex post facto* question. The *Mickens–Thomas* court did not view the 1996 amendment to the Parole Act as simply reordering policy considerations that had always been reviewed by the parole board, but rather, found the change in language in the 1996 amendments to signal a change in the weight to be afforded those policy concerns within the deliberative process of considering an application for parole. *Id.* at 385. Although the Circuit Court did have the benefit of the recent pronouncement of this court in *Winklespecht*, the court did not consider that case dispositive in its analysis of Mr. Mickens–Thomas' *ex post facto* claim. Focusing on the critical points established by the United States Supreme Court in the *Morales* and *Garner* decisions, the court concluded that the change

in emphasis in the parole process could create a significant risk of prolonged incarceration. Accepting the premise that an *ex post facto* violation may occur through application of the amended parole policy guidelines to a prisoner sentenced before the adoption of the 1996 amendments, the court then turned to the specific circumstances in Mr. Mickens–Thomas' case. Specifically the court looked at the emphasis by the parole board on public safety as a paramount consideration in denying the application for parole. In the court's view, the concern for public safety eclipses other factors in weight after the 1996 amendment. Thus, if the application for parole had been reviewed prior to the amendment, when public safety was not so heavily emphasized, it was more likely than not that parole would have been granted on the facts of this case. Accordingly, the court concluded that Mr. Mickens–Thomas had established a substantial likelihood of an increase in the period of his incarceration because of the policy changes. The case was then remanded to the parole board to reconsider the application for parole in light of the Circuit Court's observations regarding the *ex post facto* claim.[2]

A short time after the decision in *Mickens–Thomas*, this court again visited the question of *ex post facto* challenges to the denial of parole in the case of *Finnegan*. The appellant in that case presented his claim through a writ of mandamus. A majority of the court agreed that mandamus was the proper vehicle to bring a constitutional challenge to the denial of parole. *Id.* at 687. Then, reaching the merits of the constitutional *ex post facto* claim the majority found that the amendments did not alter the criteria the parole board used in exercising its discretion on parole applications. *Id.* at 688. The majority firmly stated that a change in policy guiding the

**2.** On remand the board again denied the application for parole. The matter was again brought to the Third Circuit Court of Appeals where the petition for habeas relief was granted and the board was ordered to release Mr. Mickens–Thomas on parole, as the court found an *ex post facto* violation had occurred. *Mickens–Thomas v. Vaughn*, 355 F.3d 294 (2004). Although one could question the Third Circuit's conclusion that an ex *post facto* violation had been established on the facts presented, it cannot be contested that the Third Circuit applied the correct legal standard in reaching its conclusion.

discretion of the parole board can never support a claim of an *ex post facto* violation in the denial of parole. *Id.* at 690. As for the decision in *Mickens–Thomas*, the *Finnegan* court distinguished that case on the basis of the distinctive factual assertions made by the litigants to support their claims of an ex *post facto* violation in the two cases:

> *Mickens–Thomas* concerned the issue of greater emphasis being given to the public safety factor in the parole decision, whereas public safety was not even a factor mentioned as a basis for the denial of parole in appellant's case. Thus, we are not bound by the Third Circuit's decision.

*Id.,* at 689.

Justice Saylor authored a dissent in *Finnegan,* joined by myself, and Justice Nigro. The primary point of dissonance between the dissent and majority was on the question of whether an *ex post facto* claim may arise from a change in parole guidelines. The majority definitively stated that "the *ex post facto* clause does not apply to the parole guidelines ..." *Id.* at 690. The dissent disputed that holding, pointing out that the underlying issue was one controlled by federal law, and reminding the majority that in *Garner,* the United States Supreme Court unmistakably recognized that the *ex post facto* clause bars retroactive changes in parole policies that create a substantial risk of prolonging a prisoner's incarceration. The dissenting Justices favored a remand to allow for a hearing to consider Finnegan's statistical evidence that a systematic change in parole policies following implementation of the 1996 amendments created a significant risk of prolonged incarceration, in support of his *ex post facto* claim.

In the case at bar, the majority recognizes that tension exists between the decisions of this court in the recent opinions of *Winklespecht* and *Finnegan,* and the concurrent pronouncement of the Third Circuit Court of Appeals in *Mickens–Thomas.* The majority summarily rejects the decision in *Mickens–Thomas.* It is the kernel of reasoning upon which the federal and state opinions on this question diverge that causes me to reject the analysis of the majority. The ultimate question of whether a change in parole policy that creates a

substantial risk of prolonging incarceration may constitute an *ex post facto* violation has been answered in the affirmative by the United States Supreme Court. *Garner; Morales.*

What the majority herein is missing is that the decisions by this court in *Winklespecht* and *Finnegan* fail to accept and comport with the holdings of the United States Supreme Court on the question of whether parole policy changes can provide a legitimate basis to assert an *ex post facto* violation. The majority now compounds that mistake by its blanket refusal to consider the reasoning employed by the Third Circuit in *Mickens–Thomas*. The critical point is that a change in parole policy as applied to a person sentenced under the previous policy can in fact create an increase in that person's period of incarceration and that any individual prisoner has the right to mount such a challenge. Whether the prisoner can demonstrate that a violation has occurred, and that he in fact faces a significant risk of an increase in punishment by application of the new policy, is a question of proof.

By rejecting the Third Circuit's opinion in *Mickens–Thomas*, the majority in this instance repeats the original error committed by our court in *Winklespecht* and *Finnegan*.[3] Further the majority reaches its conclusion by blindly applying the policy statement as to the impact of inferior federal case law on the decision-making of this tribunal. Although I agree

---

**3.** I recognize that *Finnegan* is a recent majority decision of this court and under the doctrine of *stare decisis* it would ordinarily be entitled to adherence as precedential authority. However, this court has never uncritically employed the concept of *stare decisis* to perpetuate error, particularly in the constitutional arena, where the Legislature cannot correct any error we make. *See generally Hohn v. United States*, 524 U.S. 236, 251, 118 S.Ct. 1969, 1977, 141 L.Ed.2d 242 (1998) ("Considerations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress is free to alter what we have done.") (internal quotation marks omitted). As I firmly believe the opinion in *Finnegan* erroneously fails to follow binding federal authority, I do not believe we should continue to perpetuate that error by hiding behind a judicial doctrine. *See, e.g., Hack v. Hack*, 495 Pa. 300, 433 A.2d 859, 867–68 (1981) (abolished doctrine of interspousal immunity and recognized that "[t]his court has full authority, and the corresponding duty to examine its precedents to assure that a rule

with the majority that decisions of inferior federal courts are not binding on this court, and will merely be looked to as potentially persuasive authority on questions of federal law, my problem is that the majority fails to apply that principle in this case. The majority fails to consider the reasoning of the inferior federal court before summarily rejecting it.

I must dissent from the majority's refusal to consider the reasoning of an inferior federal court on a question of federal law. Furthermore, I dissent as I believe the decisions in *Winklespecht* and *Finnegan* are in error as they ignore the holdings of the United States Supreme Court in *Garner* and *Morales*.

Justices NIGRO and SAYLOR join this dissenting opinion.

previously developed is not perpetuated when the reason for the rule no longer exists and application of the rule would cause injustice"); *Mayle v. Pennsylvania Department of Highways*, 479 Pa. 384, 388 A.2d 709, 720 (1978) (abolished doctrine of sovereign immunity and recognized that *"[s]tare decisis* should not be invoked to preserve a rule of law when [there is] no better reason for [it] than [that] is was laid down in the time of Henry IV"); *Mayhugh v. Coon*, 460 Pa. 128, 331 A.2d 452, 456 (1975) ("the doctrine of stare decisis was never intended to be used as a principle to perpetuate erroneous principles of law"); *Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877, 887–89 (1973), ("the doctrine of *stare decisis* is not a vehicle for perpetuating error, but rather a legal concept which responds to the demands of justice, and thus, permits the orderly growth processes of law to flourish"); *Olin Mathieson Chemical Corp. v. White Cross Stores, Inc.*, 414 Pa. 95, 199 A.2d 266, 268 (1964), ("While it is true that great consideration should always be accorded precedent, especially one of long standing and general acceptance, it doesn't necessarily follow that a rule established by precedent is infallible.... If it is wrong[,] it should not be continued. Judicial honesty dictates corrective action"); *Commonwealth v. Lawrence*, 326 Pa. 526, 193 A. 46 (1937) ("[we are by] no means unmindful of the salutary tendency of the rule of [sic] *stare decisis*, but at the same time we cannot be unmindful of the lessons furnished by our own consciousness, as well as by judicial history, of the liability to error and the advantages of review"). Moreover, to the extent the majority would argue the doctrine of *stare decisis* required that the application of the 1996 parole guidelines can *never* result in an *ex post facto* violation, *see* Majority Opinion at 254–55, 851 A.2d at 865, it is mistaken. Further, it should be noted that *Finnegan's* determination was based upon a counting error because, as discussed above, *Finnegan* relied upon *Winklespecht* in this regard, and *Winklespecht* does not reflect majority support for such a position. *See, e.g., Finnegan*, 838 A.2d at 691 (Saylor, J., dissenting).