**[J-11-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 794 CAP |
| | : | |
| Appellant | : | Appeal from the Order entered on |
| | : | December 27, 2021 in the Court of |
| | : | Common Pleas, Wayne County, |
| v. | : | Criminal Division at No. 64 of 1991. |
| | : | |
| | : | SUBMITTED:  January 18, 2023 |
| MICHAEL CONFORTI, | : | |
| | : | |
| Appellee | : | |

**OPINION**

**JUSTICE MUNDY**                    **DECIDED:  October 23, 2023**

In this direct capital appeal, the Commonwealth appeals the PCRA court's grant of relief to Appellee Michael Conforti, vacating his convictions for murder of the first degree, kidnapping, rape, criminal conspiracy to commit murder, criminal conspiracy to commit rape and criminal conspiracy to commit kidnapping and his resulting death sentence.  For the reasons set forth below, we affirm the PCRA court's order vacating Conforti's convictions.

## I.    Background

Conforti's convictions and sentence stem from the kidnapping, rape, and murder of the victim, Kathleen Harbison.  A full recitation of the circumstances surrounding Ms. Harbison's murder is not necessary for the purpose of addressing the issues currently before the Court.    Briefly, however, this Court previously summarized those circumstances as such:

On December 20, 1990, [Ms.] Harbison [ ] was with her friend Sue Fritz at Cousins Restaurant and Bar in Wayne County. While there she was seen in the company of [Mr. Conforti] and James Bellman, both of whom she had met for the first time. During the early morning hours of December 21, 1990, Ms. Harbison left the bar to warm up her car while Ms. Fritz said goodbye to some friends. A few minutes later Ms. Fritz found Ms. Harbison's car in the parking lot with the engine running, the driver door locked, the passenger door unlocked, the heater running, the radio on high volume and Ms. Harbison's purse on the seat. Ms. Harbison was nowhere to be found. Bellman was seen in his car, parked next to Ms. Harbison's car, before Ms. Fritz came outside.

\* \* \*

[Ms.] Harbison's body was found on December 22, 1990, in a secluded wooded area in Wayne County. The cause of death was multiple stab wounds. She had been stabbed twelve times. Four of the wounds were lethal. There was evidence that Ms. Harbison had been bound [ ] both at the wrists and ankles by handcuffs and that the acts were committed by more than one individual.

*Commonwealth v. Conforti*, 626 A.2d 129, 131 (Pa. 1993).

Subsequently, Conforti and Bellman were arrested and charged with several offenses related to Ms. Harbison's death. The two men's cases proceeded independently of each other, and they were tried separately in simultaneous trials in the Wayne County courthouse, with then-Wayne County District Attorney (and future judge) Raymond Hamill[1] prosecuting Bellman, and then-Assistant District Attorney Mark Zimmer prosecuting Conforti. Relevantly, after the close of testimony in Bellman's trial, but prior to closing arguments, Hamill, Bellman, and Bellman's trial counsel Jeffrey Wander had a meeting in a conference room in the back of the courtroom. After their meeting, Bellman informed Hamill that he would testify on behalf of the Commonwealth in Conforti's then

---

[1] After Bellman's trial, District Attorney Hamill left the Wayne County District Attorney's Office. He subsequently became a judge on the Wayne County Court of Common Pleas. The PCRA court refers to him as District Attorney Hamill in its opinion while the parties refer to him as Judge Hamill in their briefs. For simplicity, we will refer to him as Hamill.

ongoing trial. We previously summarized Bellman's testimony at Conforti's trial as follows:

> On December 21, 1990 at approximately 2:00 a.m., [Bellman] and Ms. Harbison left the bar in Wayne County and went to [Conforti's] trailer home in Pike County. [Conforti] forced Ms. Harbison to engage in oral sex after directing Bellman to handcuff Ms. Harbison. [Conforti] then indicated to Bellman that he wanted to kill Ms. Harbison. The victim was then placed in Bellman's car and driven to an isolated dirt road in Wayne County where she was pulled from the car by [Conforti] and Bellman. [Conforti] then repeatedly stabbed Ms. Harbison with a knife he had obtained from his trailer before they had left.
>
> Bellman further testified as follows: that after the killing, he and [Conforti] stopped at the Ledgedale Bridge where [Conforti] threw the knife and handcuffs into the water. They then burned all of their blood-stained clothing and the car mats from Bellman's car in [Conforti's] burn barrel and cleaned and vacuumed [Conforti's] trailer and Bellman's car. Bellman identified the knife recovered from under the bridge as being the murder weapon.

*Id.*

Bellman further testified that he did not have a plea agreement with the Commonwealth in exchange for his testimony and that he decided to testify, at least partially, due to his feelings for Ms. Harbison's family. Conforti Trial N.T., 9/19/1991, 13-14. The day after Bellman's testimony, Attorney Zimmer and Attorney Robert Bryan, Conforti's trial counsel, agreed to a factual stipulation, read into evidence by the court:

> The Commonwealth and Defense have stipulated that after James Bellman had informed the District Attorney that he wished to testify at this trial -- that is to say the trial of [Conforti] -- the District Attorney told him that if he did so and pled guilty to first degree murder in his own trial, the District Attorney would not seek the death penalty.
>
> Mr. Hamill, the District Attorney, further told James Bellman that if he did not plead guilty he would receive no consideration for his testimony against [Conforti].
>
> At the time Mr. Bellman testified in this trial here yesterday, he had not made up his mind which of these options he wished to take.

> Since that time, he has pled guilty to first degree murder and he has
> been sentenced to life in prison.

Conforti Trial N.T., 9/20/1991, 35-36 (internal quotations omitted). Conforti testified in his own defense, contradicting Bellman's testimony, and denying any involvement in Ms. Harbison's murder. Conforti Trial. N.T., 9/19/1991, 130-131. The jury convicted Conforti of the above referenced offenses and he was sentenced to death on the first-degree murder charge. The trial court denied all post-sentence motions, and this Court affirmed Conforti's conviction and judgment of sentence on direct appeal. *See Commonwealth v. Conforti*, 626 A.2d 129 (Pa. 1993).

On December 21, 1995, Conforti filed a timely *pro se* petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546. Thus began the case's protracted journey to this Court. That journey included the filing of multiple amended and supplemental petitions, assignment to multiple senior judges, and the Attorney General assuming responsibility for the case from the Wayne County District Attorney's Office. Eventually the case was assigned to Senior Judge Linda Wallach Miller, who held multiple hearings in the case between October 2018 and November 2021.[2]

Relevant to the issues currently before the Court, immediately prior to the PCRA hearing on November 5, 2021, the Commonwealth provided Conforti's counsel with two mental health reports relating to Bellman from 1980. PCRA Hearing N.T., 11/5/2021, 9. The reports were created as part of a criminal case Bellman had in Wayne County in 1979, during which he was represented by Hamill who was in private practice at the time. At the hearing on November 8, 2021, the parties entered the following stipulation regarding those reports:

> There has been a stipulation by and between counsel that, after the Office
> of the Attorney General (OAG) entered its appearance for the

---

[2] By the time Judge Wallach Miller conducted the PCRA hearings Bellman was deceased, having died by suicide in 2004 while in prison.

Commonwealth in *Commonwealth v. Conforti*, 64-1990, in the Wayne County Court of Common Pleas, the OAG was provided with the file maintained by the Wayne County District Attorney's Office in connection with this case. This file has been in the possession of the OAG since that time.

Counsel further stipulate that Exhibit D-28 is a true and correct copy of a document that was contained in the Wayne County District Attorney's file for *Commonwealth v. Conforti*, and that the Commonwealth provided counsel for Mr. Conforti with a copy of this document on November 5, 2021. The document was in a folder labeled "Misc. Police Reports" and counsel for the Commonwealth from the [OAG] was unaware of its presence prior to its discovery and disclosure.

PCRA Hearing N.T., 11/5/2021, 191, Ex. D-29.

On December 27, 2021, Judge Wallach Miller (the "PCRA court") granted Conforti's Amended Petition for Writ of *Habeas Corpus* and for Collateral Relief from Criminal Conviction on multiple grounds and "vacate[d] [Conforti's] convictions and sentences in this matter due to the Constitutional violations detailed" in her accompanying opinion. PCRA Ct. Order, 12/27/2021.

## II.   PCRA Court Opinion

In its opinion[3] the PCRA court first addressed Conforti's assertions that the Commonwealth committed multiple *Brady*[4] violations during his trial. The first set of alleged *Brady* violations surround Bellman's testimony. According to the PCRA court, just before closing arguments in Bellman's trial, Hamill "took Bellman into a backroom off the courtroom to talk," and the court "assumed" Bellman's trial counsel, Jeffrey Wander, was also present during this conversation. PCRA Ct. Op., 12/27/2021, 3. The court accepted Hamill's PCRA testimony that during that meeting he explained to Bellman that the case against Conforti was weak and that Conforti could be acquitted, and that Bellman

---

[3] The PCRA Court opinion makes very minimal citations to the record in support of its findings. As such, it is not always clear what evidence the court is relying upon.

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

should testify to avoid that from happening. *Id.* During the conversation, someone also suggested that Bellman should testify so Ms. Harbison's family would know what happened. The PCRA court further found that Hamill told Bellman that "should he testify against Conforti and then enter a guilty plea, the Commonwealth would not request the death penalty." *Id.* In support of this finding, the court relied on the stipulation entered at Conforti's trial the day after Bellman testified and the PCRA hearing testimony of Attorney Zimmer regarding the preparation of the stipulation. The court found Attorney Zimmer credibly testified that he prepared the stipulation after discussion with and input from Hamill. *Id.* at 3-4. In finding Attorney Zimmer's testimony in this regard credible, the PCRA court rejected Hamill's testimony that the contents of the stipulation were false, that Bellman said he was not making a deal to testify against Conforti, and that Hamill did not offer Bellman a life sentence in exchange for Bellman's testimony. *Id.* at 4.

The PCRA court next addressed alleged ongoing plea negotiations between the Commonwealth and Bellman leading up to Bellman's decision to testify. As set forth by the PCRA court, Hamill testified that he and Attorney Wander had discussions prior to trial about Bellman testifying, but Bellman always refused. *Id.* The PCRA court also cited exchanges between Attorney Wander and the trial court during Bellman's guilty plea hearing in support of its conclusion that plea negotiations had been ongoing for some time prior to Bellman's testimony. In one exchange, the trial court asked Attorney Wander if he had discussed the plea with Bellman, and Attorney Wander responded "[y]es, Your Honor, the discussions although not finalized until moments ago have been ongoing for several weeks." *Id.* at 5 [(quoting Bellman Guilty Plea Hearing N.T., 9/19/1991, 4)]. In another exchange cited by the PCRA court, the trial court asked Attorney Wander if he had discussed the plea thoroughly with Bellman, and Attorney Wander responded "[y]es, Your Honor, I've discussed this with him on numerous occasions culminating today . . . "

*Id.* [(quoting Bellman Guilty Plea Hearing N.T., 9/19/1991, 8)]. According to the PCRA court, in his PCRA hearing testimony, Hamill could not recall what, if any, conversations he had with Attorney Wander absent asking if Bellman was interested in testifying but "did not contradict the on the record representations of [Attorney Wander] that discussions were numerous or that they had been ongoing for several weeks." *Id.* The PCRA court further surmised that "[c]learly, any [d]efense [a]ttorney worth his salt . . . would begin discussions with the prosecutor to make some sort of deal favorable to his client," and that it is "reasonable to find that a life sentence instead of a sentence of death is favorable." *Id.* The court further determined that at Conforti's trial, Attorney Bryan wanted to undermine Bellman's testimony by attacking his credibility and convince the jury he was only testifying to avoid the death penalty. *Id.*

In the PCRA court's view, "*Brady* requires that any cooperation agreement, or even an implication, promise or understanding that a Commonwealth witness would receive favorable treatment as a result of his cooperation, must be given to the defense." *Id.* at 6 (citing C*ommonwealth v. Bagnall*, 235 A.3d 1075 (Pa. 2020); *Commonwealth v. Strong*, 761 A.2d 1167 (Pa. 2000); *Commonwealth v. Moose*, 602 A.2d 1265 (Pa. 1992)). Further, according to the PCRA court, "[e]ven absent an 'understanding' or 'implication' of favorable treatment in the future, any material showing that a Commonwealth witness was looking for favorable treatment or otherwise was motivated to curry favor with the prosecution is 'textbook impeachment evidence' and must be disclosed." *Id.* (citing *Commonwealth v. Johnson*, 174 A.3d 1050 (Pa. 2017)). Applying those principles to its factual findings surrounding Bellman's decision to testify at Conforti's trial, the PCRA court determined that Bellman was negotiating with the Commonwealth for weeks prior to his testimony and that it was "reasonable" for the court to find that the ongoing "discussions between [] Hamill and Attorney Wander were negotiations to have Bellman testify to

bolster a weak case against Conforti and in return Bellman would escape the death penalty." *Id.*

The PCRA court then turned to Conforti's allegations of *Brady* violations regarding information about Bellman's mental health. Specifically, Hamill, while in private practice, represented Bellman in a case from 1979 where Bellman was charged with several offenses stemming from his assault of two teenage girls. As part of his representation of Bellman in that matter, Hamill requested funding from the trial court to have Bellman evaluated in pursuit of a possible insanity defense. Bellman was then evaluated by psychiatrists Dr. Bernard Willis and Dr. John Lesniak, both of whom prepared written reports.[5] Dr. Lesniak's report incorporated within it a report prepared by psychologist Dr. Anthony Galdieri. According to the PCRA court, Doctors Willis and Lesniak both diagnosed Bellman as a sociopath, while Dr. Galdieri found Bellman's prominent traits appeared to be sociopathic, narcissistic, and paranoid behavioral patterns. The PCRA court found Hamill received these reports in May of 1980. *Id.* at 8. The court further found that the reports "remained in the possession of the Commonwealth and only surfaced" during the PCRA hearing on November 5, 2021. *Id.* As such, according to the PCRA court, none of the evidence of Bellman's mental health issues was disclosed to Attorney Bryan prior to or during Conforti's trial. *Id.*

The PCRA court found that the information contained in the reports would have been extremely damaging to Bellman's credibility. *Id.* at 9. According to the PCRA court, the reports would have given Attorney Bryan "the ability to call the authors of these reports to tell the jury what they determined to be Bellman's mental health issues." *Id.* Further, in the PCRA court's view, the reports also would have given Attorney Bryan a "heads up"

---

[5] Dr. Lesniak's report is in the record and references Dr. Willis' report. R.R. at 1164a. Dr. Willis' report, however, is not in the record.

that Bellman might testify against Conforti "in light of the findings in all of the reports that Bellman had no empathy for others, was selfish, narcissistic, and felt no guilt." *Id.* The court rejected the Commonwealth's argument that because the reports were generated approximately eleven years prior to Conforti's trial they would have been inadmissible. In its view, the reports would have been admissible, noting that Bellman had been incarcerated for six of those years. *Id.* Further, the PCRA court found that even if the reports were inadmissible, "they would [have been] a powerful tool for the defense in many ways" as Bellman was the Commonwealth's key witness, Conforti maintained his innocence, and the rest of the evidence against Conforti was circumstantial. *Id.*

In light of its findings regarding the reports, the PCRA court discussed the Third Circuit's decision in *Dennis v. Secretary, Pennsylvania Department of Corrections*, 834 F.3d 263 (3d Cir. 2016), where the Third Circuit affirmed the district court's grant of federal *habeas* relief as a result of *Brady* violations by the Commonwealth in suppressing several pieces of favorable evidence. According to the PCRA court, *Dennis* held that *Brady* material does not have to be evidence that would have resulted in an acquittal, but rather must only be evidence that would undermine the public's confidence in the jury verdict. PCRA Ct. Op., 12/27/2021, 9-10. The lower court further opined that *Dennis* held that *Brady* material need not be admissible evidence and instead could simply be information that could be used to attack the credibility of an investigation or witness. *Id.* at 10.

Further relying on *Dennis*, the PCRA court rejected any contention by the Commonwealth that there was no *Brady* violation because Conforti and his counsel could have obtained the information regarding Bellman's mental health from sources other than the Commonwealth. *Id.* In the PCRA court's view, the *Dennis* court unequivocally rejected the application of a due diligence requirement in *Brady* analysis, finding the Supreme Court had never endorsed such a concept and that a defendant is entitled to

presume that prosecutors will disclose the information they are required to disclose. *Id.* The court found that Hamill knew about the reports and had an obligation to turn them over to the defense, even though he obtained them while representing Bellman.

Next, the PCRA court addressed Conforti's contention that Attorney Bryan was ineffective during the penalty phase of his trial for failing to properly investigate and present available mitigating evidence. The court recounted that Conforti suffered a severe brain injury in an automobile accident in 1974 at the age of eighteen, after which his family reported that his personality changed. *Id.* at 11. It cited deposition testimony from family members that after the accident Conforti went from outgoing and social to someone that "couldn't focus, couldn't handle money, couldn't hold a job, was childlike[,] and easily taken advantage of." *Id*.

The PCRA court also stated it heard expert testimony from three defense witnesses, specifically neurologist Dr. Jonathan H. Pincus and neuropsychologists Dr. Michael Gelbort and Dr. Barry Crown. *Id.* at 11-12.[6] The court also related that it heard testimony from the Commonwealth's expert, neuropsychologist Dr. Corwin Boake. According to the PCRA court, all four of the experts reached the same conclusion that "Conforti sustained a traumatic brain injury as a result of the auto accident which left him with cognitive deficiencies which affected the 'executive functions' of his brain." *Id.* at 12. The PCRA court also noted that Attorney Bryan testified that he thought Conforti had "thought pattern problems." *Id.* at 13. However, the PCRA court found, Attorney Bryan did not request funding from the trial court to have Conforti evaluated. The PCRA court determined that a reasonable defense attorney that believed his client had "thought pattern problems" should have requested a psychological evaluation. *Id.* at 14. Further,

---

[6] In its opinion the PCRA court indicated it heard testimony from all three defense experts, but one of those experts, Dr. Pincus, did not testify during the PCRA proceedings.

the court found that Attorney Bryan only briefly spoke to members of Conforti's family on a break during trial but could not even remember to which family members he spoke. *Id.* at 13. As such, the court found Attorney Bryan failed to investigate Conforti's family or social history, arrange for mental health evaluations, or gather records relating to Conforti's medical history. *Id.* at 15.

The only witness Attorney Bryan called during the penalty phase was Conforti himself, and the only other evidence he presented was a stipulation that Conforti did not have a prior criminal record. During his testimony at the sentencing phase, Conforti had, what the PCRA court described as, an "outburst" that it deemed "surprising and shocking even when reading the transcript and gives [the PCRA court] insight into the death finding." *Id.* The PCRA court described Conforti's actions as "[e]vidently, unable to cope with what was occurring, [Conforti] told the jury to sentence him to death 'if you think I did this.'" *Id.* 14-15. The PCRA court concluded that had Attorney Bryan been effective, the jury would have been informed of Conforti's cognitive damage and "known to view Conforti's statement as evidence of his cognitive limitations and the outcome may have been different." *Id.* at 15.

In addition, according to the court, defense counsel in a capital case is required to conduct a thorough investigation of the defendant's background to discover any available mitigating evidence. *Id.* (citing *Porter v. McCollum*, 558 U.S. 30 (2009)). In the court's view, this investigation must include interviewing family members and other individuals familiar with the defendant's life history, obtaining records pertaining to the defendant's background, and obtaining appropriate expert evaluations. *Id.* (citing *Williams v. Taylor,* 529 U.S. 362 (2000)).

The PCRA court concluded Conforti was prejudiced by Attorney Bryan's failures in the penalty phase. The court stated prejudice is established in the penalty phase of a

capital trial "if there is a reasonable probability that, but for counsel's ineffectiveness, a single juror would have voted for life." *Id.* (citing *Williams*, 529 U.S. at 393-94). In its view, if the expert evidence presented at the PCRA hearing was presented to the jury, there is a reasonable probability that it would have "impacted at least one juror." *Id.* at 16. The court also observed that a defendant is entitled to a new sentencing hearing when the unpresented evidence would have supported the finding of at least one additional mitigating factor. *Id.* (citing *Commonwealth v. Housman*, 226 A.3d 1249, 1286-87 (Pa. 2020)). The court found that the expert testimony would have supported a finding of mitigation under 42 Pa.C.S. §§ 9711(e)(2) and (3).[7]

Lastly, the PCRA court addressed Conforti's argument that "he was denied his constitutional right to due process and a reliable sentencing hearing because of the cumulative prejudice of the errors set forth in his [p]etitions." *Id.* According to the court, the ineffective assistance of counsel test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), "requires that prejudice be evaluated in light of the cumulative effect of all constitutional deficiencies by counsel." Further, according to the court, "cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrant relief." *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419 (1995); *Commonwealth v. Spotz*,

---

[7] **§ 9711. Sentencing procedure for murder of the first degree**

> (e) Mitigating circumstances. – Mitigating circumstances shall include the following:
>
> (2) The defendant was under the influence of extreme mental or emotional disturbance.
>
> (3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

42 Pa.C.S. §§ 9711(e)(2) and (3).

18 A.3d 244 (Pa. 2011)). The court concluded that the cumulative effect of Attorney Bryan's errors and the constitutional errors by the Commonwealth so undermined the fairness of Conforti's trial and sentencing proceeding that he is entitled to relief. *Id.* at 16-17.

## III. Issues

The Commonwealth appealed the PCRA court's holding, raising the following issues:

1. Did the PCRA court err in granting relief on a waived claim that the Commonwealth violated *Brady[ v. Maryland,* 373 U.S. 83 (1963)] by failing to disclose an inadmissible and irrelevant psychiatric report that was not material under *Brady*?

2. Did the PCRA court err in granting relief on a waived claim that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose plea negotiations with the codefendant where no such negotiations occurred and the jury was apprised of the terms of the plea agreement at trial?

3. Is a remand for further development of the record appropriate where the PCRA court vacated defendant's sentence based on ineffectiveness of counsel but in doing so relied on improper evidence and improperly limited the Commonwealth's ability to rebut defendant's claim?

4. Did the PCRA court err in vacating defendant's convictions based on cumulative error where the individual clams of error were waived and meritless and the remaining penalty-phase claim cannot justify the reversal of defendant's convictions?

Commonwealth's Brief at 4 (reordered for ease of discussion).

## IV. Discussion

On appeal we review the PCRA court's holding for a determination of whether the ruling is supported by the record and free of legal error. *Commonwealth v. Wharton*, 263 A.3d 561, 567 (Pa. 2021) (citing *Commonwealth v. Washington*, 927 A.2d 586, 593 (Pa. 2007)). We apply a *de novo* standard of review to the PCRA court's legal conclusions. *Id.* (citing *Commonwealth v. Roney*, 79 A.3d 595, 603 (Pa. 2013)). "The scope of review

is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the PCRA court level." *Commonwealth v. Koehler*, 36 A.3d 121, 177-78 (Pa. 2012) (citing *Commonwealth v. Colavita*, 993 A.2d 873, 886 (Pa. 2010)).

The Commonwealth asserts that the PCRA court erred by finding it violated *Brady* in failing to disclose Bellman's psychiatric reports that were created during his 1979 criminal case. The PCRA court found that the Commonwealth and Hamill, in his role as Bellman's defense attorney, received the psychiatric reports in question in June of 1980 and that the reports remained in the possession of the Commonwealth until it turned them over to Conforti's counsel prior to the PCRA hearing on November 5, 2021. PCRA Ct. Op., 12/27/2021, 8. The law governing *Brady* claims is well settled:

> In *Brady*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The Supreme Court subsequently held that the duty to disclose such evidence is applicable even if there has been no request by the accused, and that the duty may encompass impeachment evidence as well as directly exculpatory evidence. Furthermore, the prosecution's *Brady* obligation extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution.

*Commonwealth v. Lambert*, 884 A.2d 848, 853-54 (Pa. 2005) (internal citations and quotations omitted). The prosecution's duty under *Brady* is limited as "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles*, 514 U.S. at 436-37 (citing *U.S. v. Bagley*, 473 U.S. 667, 675 and n.7 (1985)). "Thus, there are three necessary components that demonstrate a violation of the *Brady* strictures: the evidence was favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued."

*Lambert*, 994 A.2d at 854 (quoting *Commonwealth v. Burke*, 781 A.2d 1136, 1141 (Pa. 2001)).

Initially, the Commonwealth argues Conforti waived any claim that it violated *Brady* by not raising his claim sooner. According to the Commonwealth, Conforti relies on Bellman's averments in pleadings from the 1979 case that Bellman was insane and requested funding for a psychiatric evaluation. Bellman's averments occurred in pleadings from 1980 and Conforti's trial took place in 1991, more than a decade later. The Commonwealth asserts Conforti's failure to raise a *Brady* claim related to these averments in his post-verdict motions or on direct appeal resulted in the issue being waived for PCRA purposes. Commonwealth's Brief at 54 (citing 42 Pa.C.S. § 9543(a)(3); *Chmiel*, 30 A.3d at 1129-30). The Commonwealth's waiver argument, however, misconstrues the PCRA court's finding. The court did not find the Commonwealth violated *Brady* by failing to disclose the existence of the averments in Bellman's pleadings. Rather, as the Commonwealth recognizes, *id.* at 54 n.5, the court determined the Commonwealth's failure to disclose the psychiatric reports prepared as part of the 1979 case, rather than the averments themselves, violated *Brady*. PCRA Court Op., 12/27/2021, 7-8.

In order to be eligible for relief under the PCRA, a petitioner must plead and prove that the issue was not previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). An issue is waived for PCRA purposes if it could have been raised earlier in the proceedings, at trial, post-trial, or on direct appeal. 42 Pa.C.S. 9544(b); *Commonwealth v. Bomar*, 104 A.3d 1179, 1191 (Pa. 2014); *Roney,* 79 A.3d at 609. Contrary to the Commonwealth's assertion, Conforti could not have raised his current *Brady* claim during post-trial motions or on direct appeal, because he did not have Bellman's psychiatric reports at that time. The parties stipulated that the Commonwealth did not provide the reports to Conforti until

November 5, 2021, after they were discovered by the attorney for the Commonwealth in the file provided to the Attorney General's Office by the Wayne County District Attorney's Office. PCRA Hearing N.T., 11/8/2021, 191, Ex D-29. Conforti then made an oral motion to amend his petition to include the newly disclosed reports at the end of the PCRA hearing on November 8, 2021, a request the PCRA court granted. *Id.* at 195; PCRA Ct. Order, 11/8/2021. As such, Conforti raised his *Brady* claim at the earliest possible instance, a mere three days after obtaining the records. This claim is, therefore, not waived under Section 9543(3).[8]

Substantively, the Commonwealth first argues the PCRA court's finding that the reports were in the Commonwealth's possession in 1980 is not supported by the record. While the Commonwealth concedes it obviously came into possession of the reports at some point prior to the November 5, 2021 hearing where it disclosed them, it contends there is no evidence that proves when the Commonwealth actually obtained the reports or that it had access to or knowledge of them during Conforti's 1991 trial. Commonwealth's Brief at 57. In support of his position that the record supports the PCRA court's finding, Conforti points to a pleading filed by the Commonwealth in Bellman's 1979

---

[8] In response to the Commonwealth's waiver argument, Conforti, like the PCRA court, relies on the Third Circuit's decision in *Dennis* to argue that there is no due diligence requirement for a defendant asserting a *Brady* claim. We observe that the Third Circuit's pronouncement in *Dennis* that *Brady* does not include a due diligence requirement, *Dennis*, 834 F.3d at 890, is in apparent conflict with caselaw from this Court that there is no *Brady* violation where a defendant could have uncovered the undisclosed evidence with reasonable diligence. *See, e.g., Bagnall*, 235 A.3d at 1091; *Commonwealth v. Morris*, 822 A.2d 684, 696 (Pa. 2003); *Commonwealth v. Carson*, 914 A.2d 220, 245 (Pa. 2006). This apparent conflict is not directly before us, and its resolution is unnecessary for disposing of the Commonwealth's waiver argument. We note, however, that while this Court is clearly bound by the holdings of the United States Supreme Court on issues of federal law, we are not bound by the holdings of the Third Circuit on such issues. *Hall v. Pennsylvania Bd. Of Probation and Parole*, 851 A.2d 859, 865 (Pa. 2004).

case where the Commonwealth stated it received Dr. Lesniak's report on May 7, 1980. Conforti's Brief at 70. Conforti further argues that he questioned Hamill about the pleading during his PCRA testimony and that Hamill testified he did not remember if he provided the Commonwealth with Bellman's psychiatric reports in 1980 but that there were times in his practice when he would provide such reports to the Commonwealth. *Id.* (citing PCRA Hearing N.T., 11/8/21, 82-83, 96).

The pleading Conforti cites is entitled "Statement [o]f Facts" and was filed by the Commonwealth in Bellman's 1979 case in opposition to Bellman's motion to dismiss and in support of the Commonwealth's request for an extension of time in which to begin trial. Statement of Facts, 5 (unpaginated); R.R. 1409a. Within the pleading the Commonwealth states '[a]ccording to the examining psychiatrist, Dr. John Lesniak arrangements were not made for the examination until May 7, 1980, and the report was not received until approximately June 8, 1980 by the defendant's counsel and **June 23, 1980 by the Commonwealth**." *Id,* at 1-2 (unpaginated); R.R. 1405a-1406a (emphasis added). The Commonwealth's acknowledgement in this pleading that the Commonwealth was in possession of the Lesniak and Galdieri[9] reports in 1980 supports the PCRA court's finding.[10] We further observe that the reports turned over by the Commonwealth contain what appear to be contemporaneous handwritten notes indicating possible sentence recommendations. These notes further support the conclusion that the Commonwealth was in possession of the reports in 1980. *See* Lesniak Report; R.R. 1464a-1470.

---

[9] The Galdieri report was attached to the Lesniak report.

[10] The PCRA court found that both Hamill and the Commonwealth received the Lesniak report in May 1980. PCRA Ct. Op., 12/27/2021, 8. The pleading indicates that Hamill received the report in May 1980 but that the Commonwealth did not receive it until a month later in June 1980. The one-month difference between the PCRA court's determination and date indicated in the Statement of Facts is immaterial as, based on either date, the Commonwealth was in possession of the reports well before Conforti's trial in 1991.

Importantly, not only did the Commonwealth possess the reports in 1980 but the reports were located in Conforti's case file. Through the parties' stipulation, the Commonwealth acknowledged the psychiatric reports were located in its Conforti case file the Attorney General received from the Wayne County District Attorney's Office and that they were in a file folder within the case file marked "Misc. Police Reports." PCRA Hearing N.T., 11/8/2021, 191. Pursuant to *Brady*, a prosecutor's disclosure obligation includes evidence known to or readily ascertainable to the government actors involved in the defendant's prosecution. *Commonwealth v. Weis*, 81 A.3d 767, 792 (Pa. 2013). The fact that the psychiatric reports were located in the Commonwealth's Conforti case file demonstrates that the reports were readily ascertainable and available to the Commonwealth. The nondisclosure of the reports located in the Commonwealth's Conforti case file violated *Brady*. The Commonwealth cannot hide behind its failure to disclose the reports earlier, which was its obligation, to now argue Conforti cannot prove exactly when the Commonwealth came into possession of those reports. The Commonwealth had an obligation to disclose the reports which were in its case file and failed to so do.

As to the substance of the reports, the Commonwealth argues that they are not material under *Brady* because there is not a reasonable probability that had the reports been disclosed the result of Conforti's trial would have been different. Commonwealth's Brief at 58 (citing *Commonwealth v. Willis*, 46 A.3d 648, 650 (Pa. 2012)). To this end, the Commonwealth contends the reports were inadmissible hearsay so the jury would not have been made aware of them. *Id.* at 58-59 (citing, *inter alia*, *Commonwealth v. Brown*, 342 A.2d 84, 91 (Pa. 1975)). In addition to being hearsay, the Commonwealth maintains the reports would have also been inadmissible as they were irrelevant. Even if the reports would have been admissible, the Commonwealth argues Conforti failed to prove their

admission would have likely resulted in a different outcome as the reports do not establish that Conforti did not participate in Ms. Harbison's murder.

The Commonwealth further contends that the reports could not have been used to impeach Bellman's credibility because only mental health disabilities that "impair a witness's ability to observe, recall, or report events are relevant and admissible to impeach credibility." *Id.* at 60 (citing *Commonwealth v. Davido*, 106 A.3d 611, 637 (Pa. 2014)). In the Commonwealth's view, nothing in the reports establish that Bellman was unable to accurately observe, recall, or report what happened during Ms. Harbison's murder ten years after the preparation of the reports.

The Commonwealth acknowledges that inadmissible evidence may be material for *Brady* purposes, but only, in its view, where the defendant can show there is a reasonable probability that had the evidence been disclosed the result of the proceeding would have been different. *Id.* (citing *Commonwealth v. Willis*, 46 A.3d 648, 650 (Pa. 2012)). According to the Commonwealth, in order to so prove, Conforti "would have had to show that the report would have led to other specific evidence that would have changed the outcome of his trial." *Id.* at 52 (citing *Willis*, 46 A.3d at 650). The Commonwealth asserts that the jury was aware of Bellman's potential motive to testify favorably for the Commonwealth and heard argument that Bellman was a liar and instructions from the trial court about how to assess his credibility. As such, disclosure of the reports would not have changed the outcome of the trial.

In response, Conforti argues a witness' mental health issues are admissible to undermine the reliability and credibility of the witness. Conforti's Brief at 37 (citing *Commonwealth v. Mason*, 518 A.2d 282, 285-87 (Pa. 1986); *Cohen v. Albert Einstein Med. Ctr.*, 592 A.2d 720, 726 (Pa. Super. 1991)). He further argues that a defendant has a right to present evidence so long as it is relevant and not excluded by an established

evidentiary rule, including evidence "showing the commission of a crime by someone else." *Id.* (quoting *Commonwealth v. Ward*, 605 A.2d 796, 797 (Pa. 1992)). According to Conforti, Bellman's mental health issues were also impeaching. He argues "Bellman's status as a sociopath, including his compulsion to blame others for his actions, his attempts to deceive evaluators, and his inability to feel guilt, made his testimony against Mr. Conforti unreliable as it impacted his 'ability to perceive events and to truthfully relate the facts to which he testified at trial.'" *Id.* at 40 (quoting *Commonwealth v. Davis*, 674 A.2d 214, 216 (Pa. 1996)). The reports, Conforti asserts, also would have reflected that Bellman was a sophisticated actor in the criminal justice system and that his explosive rage and ingrained pattern of behavior established his inclination and capacity to commit the crime on his own. Conforti asserts this would have supported his argument that Bellman murdered Ms. Harbison on his own. For these reasons, Conforti contends the PCRA court correctly held that the reports were favorable to the defense, and "that the information included in these psychiatric and psychological reports would have been extremely damaging to Bellman's credibility." *Id.* at 41 (quoting PCRA Ct. Op., 12/27/2021, 9).

As to materiality, Conforti contends that had the Commonwealth disclosed Bellman's mental health issues the jury would have known of his severe mental problems that exposed "his unreliability as a witness, corroborated the defense's argument that he committed this crime by himself, and shown that he had the inclination and capacity to do so." *Id.* at 47. In Conforti's view, even if the reports were not admissible, they were material because they could have been used to impeach or corral Bellman's testimony by questioning him on his diagnosis as a sociopath and other issues set forth in the reports. Further Conforti contends disclosure of the reports would have prepared Attorney Bryan for Bellman's last-minute appearance as a Commonwealth witness, instead of being

surprised by his decision to testify, allowing time to properly prepare for cross-examination.

We addressed the nondisclosure of a witness's mental health issues in the *Brady* context in *Davido*, where we stated:

> When a witness suffers from a mental disability relevant to his or her ability to accurately observe, recall or report events, the jury must be informed of the disability in order to assist it in properly assessing the weight and credibility of the witness's testimony. The evidence can be said to affect credibility when it shows that the witness's mental disorganization impaired his or her capacity to observe an event at the time of its occurrence, to maintain a clear recollection of it, or to communicate the observation accurately and truthfully at trial.

*Davido*, 106 A.3d at 637 (internal citation omitted); *see also Davis*, 674 A.2d at 216 (affirming the Superior Court's holding that a defendant was entitled to the complainant/witness's mental health records provided to the Commonwealth possibly indicating the complainant/witness was a pathological liar in order to confront the witness at trial).

The PCRA court found the psychiatric reports would have been beneficial to Conforti at trial for a multitude of reasons, including an incorrect conclusion that they would have been admissible evidence themselves, but failed to analyze the reports in the context of standard this Court set out in *Davido*. *See* PCRA Ct. Op., 12/27/2021, 9. This failure, however, does not bar this Court from affirming the PCRA court's decision on other grounds. *See In re A.J.R.-H.*, 188 A.3d 1157, 1176-77 (Pa. 2018) (the right-for-any-reason doctrine permits an appellate court to affirm the trial court's decision on any basis that is supported by the record). Unlike the PCRA court, Conforti applies the contents of the reports to the applicable legal framework. To that extent, he argues that "Bellman's status as a sociopath, including his compulsion to blame others for his actions, his attempts to deceive the evaluators, and his inability to feel guilt, made his testimony

against Mr. Conforti unreliable as it impacted his 'ability to perceive events and to truthfully relate the facts to which he testified at trial.'" Conforti's Brief at 40 (quoting *Davis*, 674 A.2d at 216).

After a careful review of the reports, we agree with Conforti's assessment. In his report, Dr. Lesniak found that Bellman suffered from a personality disorder that causes him to be "selfish, impulsive and unable to feel guilt or learn from experience." Lesniak Report at 2; R.R. 1465a. Dr. Lesniak further determined that Bellman "fit the clinical psychiatric picture of a sociopathic or antisocial personality" and "blame[s] others for his behavior." *Id.* For his part, Dr. Galdieri found that Bellman had "little or no trust for others." Galdieri Report at 2; R.R. 1469a. Bellman's "predominant traits appear to be sociopathic, along with narcissistic, paranoid behavior patterns." *Id.* at 3; R.R. 1470a. The doctors' respective findings addressed Bellman's ability to "communicate [his] observation[s] accurately and truthfully at" Conforti's trial. *Davido*, 106 A.3d at 637. Specifically, the doctors' findings that Bellman was unable to feel guilt, had a willingness to blame others, and had a sociopathic personality seriously call into question his ability to truthfully testify regarding the circumstances surrounding Ms. Harbison's murder. The reports, therefore, satisfy the standard we set out in *Davido* for when a witness' mental health issues affect a witness' credibility. *See id.* As such, the reports qualify as impeachment evidence that was favorable to Conforti and are thus *Brady* material. *Lambert*, 994 A.2d at 854. The Commonwealth was required to turn the reports over to Conforti so he could have used them during cross examination to inform the jury of Bellman's mental health issues so it could accurately assess his credibility. In addition to be used to attack Bellman's credibility, the reports would have also been of use in Conforti's counsel's preparation in anticipation of Bellman's cross-examination.

The last requirement of a *Brady* claim is prejudice. Under *Brady*, prejudice occurs when a defendant shows a "reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Commonwealth v. Bomar*, 104 A.3d at 1189 (quoting *Burke,* 781 A.2d at 1141). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Commonwealth v. Koehler*, 36 A.3d 121, 133 (Pa. 2012) (quoting *Commonwealth v. Paddy*, 15 A.3d 431, 450 (Pa. 2011)). In other words, "the undisclosed evidence must be 'material to guilt or punishment.'" *Bomar*, 104 A.3d at 1189 (quoting *Commonwealth v. Paddy*, 800 A.2d 294, 395 (Pa. 2002)). In addition, "evidence of a witness's mental health will be material only if it 'undermines [the witness's] reliability [ ] or calls into question his ability to perceive, remember and narrate perceptions accurately.'" *Lesko v. Pennsylvania Dept. of Corr.*, 33 F.4th 211, 233 (3d Cir. 2022) (quoting *United States v. Georgiou*, 777 F.3d 125, 144 (3d Cir. 2015) (brackets in original)).

The PCRA court found that Bellman was the Commonwealth's key witness against Conforti at trial. PCRA Ct. Op., 12/27/2021, 8. The record supports this conclusion. Outside of Bellman's testimony, the Commonwealth's case against Conforti was entirely circumstantial. The importance of Bellman's testimony to the Commonwealth's case was acknowledged by Attorney Zimmer and Hamill, the original prosecutors, during their respective PCRA hearing testimony. Attorney Zimmer testified that without Bellman's testimony, the case against Conforti was completely circumstantial. PCRA Hearing N.T., 11/8/2021, 103. Hamill testified that, during his conversation with Bellman and Attorney Wander discussing the possibility of Bellman testifying, the men discussed "the fact that we were unsure what any verdict would be in the Mr. Conforti trial and that it was very possible that Mr. Conforti may be acquitted at the same time it was possible he may be convicted." *Id.* at 13. The risk of Conforti being acquitted was the reason Hamill wanted

[J-11-2023] - 23

Bellman to testify. *Id.* at 68. Hamill explained the reasoning behind his assessment of the case against Conforti, testifying that while the circumstantial evidence against each defendant was mostly the same, unlike Bellman, Conforti had not given a statement inculpating himself in Ms. Harbison's murder. *Id.* at 15.

A review of the evidence presented at Conforti's trial supports the prosecutor's assessment of their case. Prior to Bellman's testimony, the Commonwealth did not produce any evidence directly connecting Conforti to Ms. Harbison's murder.[11] Bellman's testimony was the linchpin directly connecting that circumstantial evidence to Conforti. Bellman testified that Conforti produced the handcuffs, directed Bellman to handcuff Ms. Harbison and then sexually assaulted her. Conforti Trial N.T., 9/19/1991, 23. He further testified that it was Conforti's idea to kill Ms. Harbison, *id.* at 22, and that Conforti obtained the knife from his trailer after they placed Ms. Harbison in the back of Bellman's car. *Id.* at 26. Bellman also asserted Conforti was the one who physically murdered Ms. Harbison while minimizing his own involvement, testifying that Conforti stabbed Ms. Harbison while Bellman puked and dry heaved. *Id*. at 30-33. Bellman testified he never stabbed Ms. Harbison and that when Bellman said he could not kill anyone, Conforti called him a "pussy" and said he had "no fucking balls to do nothing." *Id.* at 33, 30. In Bellman's version of events, Conforti was the main actor in Ms. Harbison's murder. Conforti testified on his own behalf, denied any involvement in Ms. Harbison's murder, directly contradicting Bellman's testimony. *Id.* at 130-31.

Testifying in his own defense, Conforti's version of events differed significantly from Bellman's version. According to Conforti, shortly after he returned to his trailer from the

---

[11] The Commonwealth did present evidence that a pubic hair found in Ms. Harbison's pubic region "exhibited the same microscopic features or characteristics as the pubic hair from" Conforti. Conforti Trial N.T., 9/18/1991, 50. The evidence did not definitively conclude the questioned pubic hair belonged to Conforti.

bar, "Bellman [came] in the house and he's rushing, [h]ey, Mike, you still got those handcuffs []?". *Id.* at 107. Conforti continued that Bellman said, "I'm going to have some fun with some girl tonight, can I borrow them." *Id.* Conforti testified he then retrieved two pairs of handcuffs from his bedroom and handed them to Bellman and then Bellman left the trailer. *Id.* at 107-08; 110. Conforti continued that after Bellman left, he went to sleep, waking up around eight or nine the next morning. *Id.* at 117. When he awoke, Bellman was on the couch in the living room. *Id.* at 117-18. In Conforti's version of events he had no involvement in Ms. Harbison's murder, directly contradicting Bellman's testimony. *Id.* at 130-31.

Attorney Zimmer then highlighted Bellman's testimony in his closing. He asserted that Bellman was the only person besides Ms. Harbison that could tell the jury what happened and that his testimony showed that either Bellman committed the murder, or he did it in the company of Conforti. Conforti Trial N.T., 9/20/1991, 92. He argued that the evidence supported Bellman's testimony because the handcuffs, Ms. Harbison's glasses, and the murder weapon were found where Bellman said they would be. *Id.* at 109. Finally, Attorney Zimmer asked the jury if Bellman, as he broke down on the witness stand, looked like someone who would initiate the stabbing or more like someone who would dry heave while someone else stabbed Ms. Harbison. *Id.*

Bellman's testimony was critical to the Commonwealth's case and was directly contradicted by Conforti's own testimony. Bellman's credibility was, therefore, crucial to the case, and the Commonwealth argued that the jury should believe his testimony. If the Lesniak and Galdieri Reports had been disclosed to Conforti, he would have been able to cross examine Bellman on the mental health issues set out in those reports and attack his credibility. His diagnosis as a sociopath who did not feel guilt for his actions and tended to blame others would have called into question the credibility of his testimony

implicating Conforti as the primary actor in Ms. Harbison's murder while minimizing his own involvement. As the reports call Bellman's reliability into issue, they are material. Further, because of the importance of Bellman's testimony, if those reports were properly disclosed there is a reasonable probability the result of Conforti's trial would have been different, as it could have led the jury to discredit Bellman's testimony and given more credit to Conforti's testimony that he was not involved in Ms. Harbison's murder. Conforti was prejudiced by the Commonwealth's nondisclosure. Lastly, unlike the alleged *Brady* material in *Lambert*, Bellman's psychiatric reports were not cumulative of any other available impeachment evidence. *See Lambert*, 884 A.2d at 856.

## V.    Conclusion

We affirm the PCRA court's determination that the Commonwealth committed a *Brady* violation by failing to disclose Bellman's psychological reports. Conforti's judgment of sentence is vacated.[12]

Chief Justice Todd and Justices Donohue, Dougherty, Wecht and Brobson join the opinion.

---

[12] As we uphold the PCRA court's vacation of Conforti's convictions and sentence on this basis, we need not address the other issues raised by the Commonwealth.